```
 1 | L. KIERAN KIECKHEFER, SBN 251978
   |    kkieckhefer@gibsondunn.com
 2 | JOSEPH A. GORMAN, SBN 267553
   |    jgorman@gibsondunn.com
 3 | CHRISTINA MYROLD, SBN 324183
   |    cmyrold@gibsondunn.com
 4 | GIBSON, DUNN & CRUTCHER LLP
   | One Embarcadero Center, Suite 2600
 5 | San Francisco, CA 94111-3715
   | Telephone: 415.393.8200
 6 | Facsimile: 415.393.8306
   |
 7 | ILISSA SAMPLIN, SBN 314018
   |    isamplin@gibsondunn.com
 8 | GIBSON, DUNN & CRUTCHER LLP
   | 333 South Grand Avenue
 9 | Los Angeles, California  90071-3197
   | Telephone:  213.229.7000
10 | Facsimile:  213.229.7520
   |
11 | AHMED ELDESSOUKI, pro hac vice forthcoming
   |    aeldessouki@gibsondunn.com
12 | GIBSON, DUNN & CRUTCHER LLP
   | 200 Park Avenue
13 | New York, California  10166-0193
   | Telephone:  212.351.4000
14 | Facsimile:  212.351.4035
```

FILED
JAN 16 2024
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*Attorneys for Plaintiff*
*CADENCE DESIGN SYSTEMS, INC.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CADENCE DESIGN SYSTEMS, INC., a Delaware corporation, | Case No. 24 00290 |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| JEFFREY APPLEBAUM, | **(FILED UNDER SEAL)** |
| Defendant. | |



Gibson, Dunn & Crutcher LLP

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.

Plaintiff Cadence Design Systems, Inc. ("Cadence") hereby complains and alleges the following against Defendant Jeffrey Applebaum ("Mr. Applebaum").

## NATURE OF THE ACTION

1. Cadence is an industry leading computational software company that produces software, hardware, and silicon structures for designing integrated circuits, systems on chips, and printed circuit boards. Until December 2023, Mr. Applebaum was a Senior Account Executive at Cadence, responsible for sales of Cadence products to over 60 of the world's leading technology and semiconductor companies. Mr. Applebaum left Cadence on Friday, December 15, 2023 to join a competitor (although when asked, he refused to tell Cadence the name of the competitor). The sequence of events leading up to, and following, his last day at Cadence has revealed that Mr. Applebaum stole a massive amount of Cadence's proprietary and trade secret data, is a sophisticated thief who figured out a creative way to steal massive amounts of Cadence proprietary information *and* a creative way to hide his conduct, and outright lied about it repeatedly once caught, and that Mr. Applebaum still has possession of at least one device containing Cadence's proprietary information and trade secrets to this day, despite previously swearing under penalty of perjury that he does not.

2. Cadence brings this lawsuit to take action against Mr. Applebaum's theft of Cadence trade secrets and breach of his agreement concerning proprietary information with Cadence. Cadence seeks a temporary restraining order, monetary damages, including punitive damages, return of Cadence's trade secret and proprietary information, and an injunction prohibiting Mr. Applebaum from continued possession, disclosure, or use of Cadence trade secret and proprietary information.

## THE PARTIES, JURISDICTION, AND VENUE

3. Plaintiff Cadence is a Delaware corporation with its headquarters located at 2655 Seely Avenue, San Jose, California 95134. Cadence is a leader in Electronic Design Automation ("EDA") and computational software industries. Cadence offers software, hardware, services and reusable integrated circuit design blocks that enable technology companies to develop and deliver end-user electronic products, as well as integrated circuits, systems on chips, and printed circuit boards for use in end-user electronic products. Cadence offerings are used by a wide array of customers, including semiconductor manufacturers, car makers, wireless technology makers, and others. Cadence's

sophisticated suite of product offerings helps engineers to design, model, and optimize integrated circuits, circuit boards and other electronic components used in a myriad of industries—from computers, to cell phones, to remote-controlled drones.

4. Defendant is a former employee of Cadence. On information and belief, Defendant resides in Los Gatos, California, which is located in Santa Clara County in the Northern District of California.

5. This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other claims pled herein pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant is resident in this district, such that he is subject to the general jurisdiction in this District. In addition, a substantial part of the events or omissions giving rights to the claims pled herein took place in this District. Specifically, while working for Cadence in San Jose, in Santa Clara County, in the Northern District, Mr. Applebaum stole and misappropriated Cadence confidential and trade secret documents and information. Moreover, Mr. Applebaum agreed to, and executed, an Employee Proprietary Information and Inventions Agreement ("EPIIA") with Cadence, which Mr. Applebaum breached in this District. By agreeing to and executing the EPIIA, Mr. Applebaum "consent[ed] to the personal jurisdiction of the state and federal courts located in Santa Clara County, California for any lawsuit filed there against [him] by [Cadence] arising from or related to this Agreement." EPIIA §12.2.

## FACTS

**OVERVIEW OF CADENCE**

7. Cadence is a pioneer in EDA and computational software industries, and offers products and services to support different design activities conducted by Cadence customers for the development of electronic devices.

8. Cadence's customers include the world's largest and most sophisticated technology companies. Cadence's offerings enable Cadence's customers to develop and deliver to end-users electronic devices, such as smartphones, laptop computers, gaming systems, automobiles, autonomous driving systems, serves, cloud data center infrastructure, artificial intelligence systems, aerospace and

3
COMPLAINT AND DEMAND FOR JURY TRIAL

defense, medical equipment, and networking products (amongst many other types of products). Cadence products and services also enable Cadence's customers to develop and deliver to components used in end-user electronic devices, such as integrated circuits, memory chips, system-on-chips ("SoCs"), analog chips, processors, printed circuit boards (amongst may other types of components).

9. Cadence's offerings are similarly highly sophisticated and specialized, to match the sophistication of Cadence's customers. Cadence's offerings include offerings related to the following electronics design activities: Custom Integrated Circuit ("IC") Design and Simulation, Digital IC Design and Signoff, Functional Verification, IP, and System Design and Analysis.

10. Cadence Custom IC Design and Simulation offerings include the Virtuoso® Custom IC Design platform, which is used by Cadence customers to create schematic and physical representations of circuits down to the transistor level for analog, mixed-signal, custom digital, memory and RF designs.

11. Cadence Digital IC Design and Signoff offerings include the Genus™ Synthesis Solution, the Innovus™ Implementation System, the Tempus™ Timing Signoff Solution, Voltus™ Power Integrity Solution, the Quantus™ Extraction Solution, and the Pegasus™ Physical Verification System. These offerings are used by Cadence customers to create logical representations of digital circuits or an IC that can be verified for correctness prior to implementation.

12. Cadence Functional Verification offerings include the Cadence Verification Suite™, which has four primary verification engines: the JasperGold® Formal Verification Platform, Xcelium™ Parallel Logic Simulation Platform, the Palladium® Enterprise Emulation Platform, and the Protium™ FPGA-Based Prototyping Platforms. These offerings are used by Cadence customers to effectively and efficiently verify that the circuitry or the software they have designed is consistent with the functional specification.

13. Cadence IP offerings include Tensilica® configurable digital signal processors ("DSPs") and a broad range of Verification IP ("VIP") with models. Cadence's IP offerings are pre-verified, customizable functional blocks, which Cadence customers integrate into their ICs to accelerate the development process and to reduce the risk of errors in the design process.

14. Cadence System Design and Analysis offerings include the Allegro® System Design Platform, the OrCAD® family of offerings, the Clarity™ 3D Solver, the Celsius™ Thermal Solver, and others. These offerings are used by Cadence customers to develop PCBs and IC packages and to analyze electromagnetic, electro-thermal and other multi-physics effects.

**CADENCE PROPRIETARY INFORMATION**

15. Through Cadence's efforts and investments over decades, Cadence is an industry leader in the EDA and computational software industries, and has accumulated a wide variety of proprietary information that it maintains in a variety of formats (predominantly as electronic documents, but also in other formats, such as printed documents). Cadence uses its proprietary information to compete against formidable competitors in the relevant industries.

16. Examples of Cadence trade secret information (the "Cadence Trade Secret Information") that Cadence maintains, and uses in its day-to-day operations, include, without limitation: (i) pricing information, including price books and pricing calculators for Cadence's product and service offerings, discount policies, workbooks to price product and service configurations and to generate a recommended product and service configuration for a specific customer, and metrics and analyses to analyze pricing proposals and deal terms; (ii) sales strategy information, including analyses and strategies to target specific accounts, reviews and analyses of specific customer and prospective customer accounts, analyses and strategies to target specific geographic territories and specific industries, listings of existing sales and sales opportunities, information concerning the sales cycle with specific Cadence customers and prospective customers, contract renewal dates associated with existing sales, and Cadence policies concerning commissions to members of its sales team; (iii) customer contracts, which include confidential information concerning each the specific Cadence products and services that each customer has contracted for, as well the revenue to Cadence associated with the contract, the specific terms that the customer agreed to, and the termination and renewal dates of the contract; and (iv) confidential information concerning Cadence's product offerings, including specifications, roadmaps, internal design documents, and other technical information.

17. Examples of Cadence confidential information (the "Cadence Confidential Information") that Cadence maintains, and uses in its day-to-day operations, include, without limitation

certain internal Cadence emails and certain internal Cadence policies, such as policies relating to Cadence's internal sales operations and practices, as well as employee and HR policies. This Complaint refers to Cadence Trade Secret Information and Cadence Confidential Information collectively as the "Cadence Proprietary Information."

**CADENCE PROTECTS THE SECRECY OF ITS PROPRIETARY INFORMATION**

18. Cadence invested considerable time, money, and effort to protect the secrecy of Cadence Proprietary Information and to ensure that such information is not disclosed outside the company, or to the public generally.

19. Cadence employees are required to follow strict confidentiality with respect to the Cadence Propriety Information, including through signing non-disclosure agreements, signing Cadence's Employee Handbook, agreeing to abide by Cadence's Data Classification Policy and Employee Data Loss Protection Protocol, all of which prohibit employees from disclosing Cadence Proprietary Information. In particular, Cadence requires its employees execute the EPIIA as a condition of their employment, which requires that employees "keep in confidence and not use for any purpose other than the performance of [their] duties to the Company, or disclose to third parties without [Cadence's] consent, any Proprietary Information." EPIIA, § 2.5.

20. All Cadence employees must undergo information security and intellectual property protection training when they onboard, which must then be renewed on an annual basis. These trainings cover Cadence's numerous policies and guidelines governing employees' proper access to and use of information technology assets, including networks and computers, as well as policies and guidelines governing the proper storage, handling, and transfer of proprietary and confidential information internal and external to the company, including with customers.

21. Cadence has enacted security measures to protect Cadence Propriety Information, including, but not limited to: (1) monitoring and logging file transfer activities conducted on Cadence computers; (2) controls designed to protect its network from unauthorized access and unauthorized software installation; (3) network segmentation and firewalls used to control access to confidential information; (4) procedures that restrict employee access to network folders and data sources to those which are necessary to perform their job functions; and (5) Cadence computers are subject to technical

controls that prevent users from transferring data onto storage devices, such as USBs, and cloud-based file sharing websites.

22. Customers and prospects sign non-disclosure agreements before Cadence Proprietary Information is disclosed to them.

23. Access to Cadence software products is limited to authorized users who have a valid license key.

24. Cadence also conducts and exit process for each departing employee, and reminds them of their confidentiality obligations to Cadence. Moreover, Cadence's internal policy is to review file transfer activities associated with employees departing to competitors, or to employees who refuse to inform Cadence of their new employer.

**MR. APPLEBAUM'S EMPLOYMENT WITH CADENCE**

25. Mr. Applebaum began working at Cadence in March 2006, and only recently left. He was Account Executive for Cadence for the last seven years. In his role as an Account Executive, Mr. Applebaum was responsible for sales activities of the complete portfolio of Cadence's offerings, and had specific customer and prospective customer accounts assigned to him. Mr. Applebaum was responsible for maintaining the relationship between Cadence and the customers and prospective customers that were assigned to him. He was extensively involved with existing and prospective customers throughout the sales cycle, where he would work with Cadence customers to identify specific Cadence software and modules that the customer needs and the appropriate pricing for the software, recommend and facilitate solutions and proposals, and assist in delivering Cadence's products and services.

26. Mr. Applebaum had access to the types of Cadence Proprietary Information listed above, as those types of information were directly relevant to his role. Moreover, Mr. Applebaum had stored a large volume of documents containing the types of Cadence Proprietary Information listed above on his Cadence-issued work laptop.

**MR. APPLEBAUM'S EXIT FROM CADENCE**

27. Mr. Applebaum gave notice that he was leaving Cadence on December 8, 2023, with his last day being December 15. Mr. Applebaum informed Cadence that he was going to work for a

7
COMPLAINT AND DEMAND FOR JURY TRIAL

competitor of Cadence, but refused to name the competitor.

28. On December 10, 2023, Mr. Applebaum signed an Exit Interview Schedule, confirming that he had returned to Cadence all Cadence documents, data, and records. In particular, the Exit Interview Schedule that Mr. Applebaum signed stated that he "returned to Cadence all such copies of any Cadence materials . . . including, but not limited to: (1) financial and pricing information; (2) business, research and new product plans, objectives, and strategies, (3) techniques, designs, capabilities, and systems; (4) customer and vendor lists, contacts, plans, and agreements with customers, vendors, and others; (5) marketing information; (6) program and product designs, specifications, and source code; and (7) personnel lists, organization charts and information regarding aspects of individual skills and salaries of various Cadence personnel."

**CADENCE DISCOVERS THAT MR. APPLEBAUM STOLE THOUSANDS OF FILES CONTAINING CADENCE PROPRIETARY INFORMATION**

29. After Mr. Applebaum provided his notice of resignation, Cadence retrieved and reviewed activity logs associated with Mr. Applebaum's Cadence-issued work laptop, in accordance with Cadence's internal policies designed to prevent exfiltration of Cadence Proprietary Information to competitors. Upon reviewing the logs, Cadence determined that Mr. Applebaum had transferred large volumes of data from his work laptop to his personal laptop using a network, including approximately 107,000 files on November 18, 2023. Realizing that he could use his home network to facilitate a theft that would otherwise be blocked by Cadence security protections was sophisticated and creative—and, to the best of Cadence's knowledge, no one at Cadence has ever bypassed Cadence IT security protections like this before. On information and belief, Mr. Applebaum knew at that point in time that he would be leaving the company he had worked at for decades to join a competitor. Indeed, there would be no reason for Mr. Applebaum to transfer these materials from his Cadence-issued work laptop to a personal laptop *except* for use in his subsequent employment; he anticipated losing access to the files via his Cadence-issued work laptop in the not so distant future, when he left the company.

30. Cadence confronted Mr. Applebaum with its discovery on December 15, and asked him to provide his personal laptop to Cadence for inspection. Cadence also instructed him not to delete any

files form his personal laptop until Cadence had an opportunity to inspect it. Mr. Applebaum agreed.

**MR. APPLEBAUM ADMITS TO STEALING CADENCE PROPRIETARY INFORMATION AND TO BREACHING THE EPIIA**

31. On December 18, Mr. Applebaum brought his personal computer to Cadence. Cadence created an image of the device, and Mr. Applebaum then deleted all remaining Cadence files on it in the presence of Cadence staff. He was asked face-to-face multiple times whether he had transferred any Cadence proprietary materials to *other* devices, and he stated that he had not.

32. Mr. Applebaum also signed a statement—*under penalty of perjury*—describing his conduct. Mr. Applebaum admitted that he had uploaded and transferred 107,000 files in violation of his employment agreements. Specifically, he averred to the following:

    a. "Cadence entrusted me with Cadence property and information, including Confidential Information (as designed by my Employee Proprietary and Inventions Agreement ("EPIIA") that I signed on July 8, 2014."

    b. "On my last day of work at Cadence, I executed an Employee Exit Acknowledgement and other exit documents in which I stated that I did not have in my possession any Cadence property or information, including Confidential Information. However, in the month prior to my termination of employment ... I uploaded files from my Cadence-assigned laptop to my personal laptop and still had possession, control, and/or custody of the files as of my termination date."

    c. "Specifically, on or about November 18, 2023, I transferred approximately 107,000 files from my Cadence laptop to my personal laptop. The files included Cadence confidential information including:

        • Thousands of files containing information about Cadence customers including [. . .] among others.

        • Over a thousand files with internal information about Cadence products.

        • A copy of an internal Cadence directory containing account information and other information relating to dozens of additional Cadence customers.

- A copy of tens of thousands of files from my 'appdata' directory on my Cadence-assigned laptop;
- Multiple Microsoft Outlook '.pst' export files each containing 44.5 GB of data."

33. In addition, Mr. Applebaum acknowledged that his "failure to return such property and Confidential Information was a severe breach of the EPIIA and Separation Agreement."

34. He further swore under penalty of perjury that he had "thoroughly reviewed all [his] devices" and affirmed that he did "not have any Cadence property or information" and did not "have access to any such Confidential Information." He also swore that he had not "transferred" or made "any recreations, copies, modifications or other versions of such files."

35. Cadence believed Mr. Applebaum's representations—after all, he swore under penalty of perjury that they were true and correct and made repeated representations that they were true to several Cadence employees. As a result, Cadence reasonably believed on December 18 that it understood the full scope of Mr. Applebaum's file transfer, and that all the files had been removed from Mr. Applebaum's personal device before having been disseminated, shared, or transferred elsewhere.

**CADENCE DISCOVERS THAT MR. APPLEBAUM LIED ABOUT THE SCOPE OF HIS MISCONDUCT**

36. Following the December 18, 2023 meeting, and only after conducting a forensic analysis, Cadence learned that Mr. Applebaum, despite being caught on December 15 and purporting to come clean on December 18, in fact engaged in additional misconduct.

37. First, Mr. Applebaum did not just transfer documents to his personal laptop; he also transferred Cadence Proprietary Information to an external Seagate drive, including from a folder titled "AX," which contained information concerning Cadence products, pricing methodologies, product configurations for specific Cadence customers, and specific license terms between Cadence and its customers. Mr. Applebaum did not disclose this Seagate device to Cadence and outright lied to Cadence when Cadence asked him on December 18 if he had transferred material to any other devices—because, as explained below, the forensics show that he accessed files containing Cadence Proprietary Information from the Seagate device just hours before making this representation to

Cadence on December 18. On information and belief, Mr. Applebaum still has possession of the external Seagate drive and the Cadence Proprietary Information that he improperly uploaded to that drive.

38. Second, after being confronted on December 15, Mr. Applebaum deleted files from the personal device he turned over on December 18, despite being instructed not to during the December 15 phone call—and before he presented his personal device to Cadence for imaging. Thus, as of now, Cadence is in the dark about the full extent of Mr. Applebaum's transfers of Cadence Proprietary Information to his personal laptop (because he deleted them) and the Seagate hard drive (because he has it and never disclosed its existence or turned it over).

39. Third, Mr. Applebaum tried a sophisticated approach to hide his tracks by running a defragmentation utility over the weekend, which runs a process that purges data blocks not in "use," including blocks that previously stored deleted files. The only reason for him to run the defragmentation process on his laptop would be to attempt to conceal metadata on that device.

40. Fourth, Mr. Applebaum accessed files containing Cadence Proprietary Information from the Seagate drive the night before he provided his personal laptop to Cadence on December 18, 2023—which is after his employment with Cadence officially terminated on December 15.

41. Thus, as of now, in light of Mr. Applebaum's deletions, defragmentation, failure to disclose all devices in his possession containing Cadence Proprietary Information, and his deliberate *lies* about devices in his possession containing Cadence Proprietary Information, Cadence is in the dark about the full extent of Mr. Applebaum's misconduct with respect to Cadence Proprietary Information on his personal laptop, the Seagate hard drive, and any other devices that may contain such information he has no legal right to access, disclose, or use. For the same reasons, as well as Mr. Applebaum's evidence deletion, Cadence likewise is in the dark about any transfers, sharing, or dissemination of Cadence Proprietary Information by Mr. Applebaum with other individuals or entities that have no legal right to Cadence Proprietary Information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Trade Secret Misappropriation under the Defend Trade Secrets Act

### (18 U.S.C. § 1836, *et seq.*)

42. Each of the foregoing paragraphs is incorporated into this First Cause of Action, as if set forth herein.

43. As discussed above, Mr. Applebaum had access to and obtained possession of large amounts of Cadence Trade Secret Information through his role as an Account Executive at Cadence.

44. Mr. Applebaum improperly transferred Cadence Trade Secret Information from his Cadence-issued work laptop to his personal laptop, and then from his personal laptop to an external storage device. Mr. Applebaum resigned from Cadence shortly thereafter to go work for a competitor of Cadence. Mr. Applebaum also accessed folders containing Cadence Trade Secret Information after his employment with Cadence terminated. Mr. Applebaum tried to hide his misconduct by deleting files, and by running a defragmentation operations, after he was confronted by Cadence about his theft.

45. On information and belief, Mr. Applebaum still has improper access to Cadence Trade Secret Information to this date.

46. On information and belief, if Mr. Applebaum is not enjoined, he will continue to access, use, disclose, or otherwise misappropriate Cadence Trade Secret Information to benefit himself and potentially his new employer, and to unlawfully compete with Cadence.

47. Mr. Applebaum's misappropriation of Cadence Trade Secret Information has caused and continues to cause substantial injury to Cadence's business and reputation, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution of the value of its trade secrets. Mr. Applebaum has been unjustly enriched by his misappropriation of Cadence's Trade Secret Information. Further, Mr. Applebaum's decision to delete files and hide his traces means that Cadence is without knowledge of the full extent of Mr. Applebaum's misappropriation and has been unable to take steps to mitigate the extent of the injury caused by Mr. Applebaum.

48. The Cadence Trade Secret Information misappropriated by Mr. Applebaum was compiled after many years of work and significant financial investment. It derives independent

economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. For example, several of the files contain information related to Cadence's highly confidential pricing, sales strategies, customer accounts, and tailored product offerings. This type of information is not generally known or publicly available and would be highly valuable to a competitor because a competitor would be able to discern Cadence's pricing and sales strategies, target specific Cadence existing customers or prospective customers, offer competitive solutions, and directly underbid Cadence to obtain the sale. The vast majority of the information relating to sales strategies and customer accounts takes years to develop. Having access to such information—in addition to Cadence's highly confidential pricing and tailored product offerings—would give a competitor a tremendous head start on prospective new customers and a roadmap for how to immediately and effectively win business from Cadence from existing customers. For this reason, access to this type of information is strictly controlled.

49. Cadence has taken reasonable efforts to preserve the confidentiality of its Trade Secret Information. Those measures include the implementation of IT tools that block and/or monitor and log the transfer of files, confidentiality agreements, employment policies, and other measures outlined above at paragraphs 18–24.

50. Cadence therefore seeks temporary, preliminary, and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to protect the secrecy of its trade secret documents and information and to remedy injury to Cadence's business interests and reputation. Cadence will continue to suffer irreparable harm absent the requested injunctive relief.

51. Cadence also seeks an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

52. On information and belief, Mr. Applebaum misappropriated Cadence's Trade Secret Information for an improper purpose and in a willful and malicious manner. Cadence therefore seeks exemplary damages up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

## Trade Secret Misappropriation under California's Uniform Trade Secrets Act

### (Cal. Civ. Code § 3426, *et seq.*)

53.  Each of the foregoing paragraphs is incorporated into this Second Cause of Action, as if set forth herein.

54.  As discussed above, Mr. Applebaum had access to and obtained possession of large amounts of Cadence Trade Secret Information through his role as an Account Executive at Cadence.

55.  Mr. Applebaum improperly transferred Cadence Trade Secret Information from his Cadence-issued work laptop to his personal laptop, and then from his personal laptop to an external storage device. Mr. Applebaum resigned from Cadence shortly thereafter to go work for a competitor of Cadence. Mr. Applebaum also accessed folders containing Cadence Trade Secret Information after his employment with Cadence terminated. Mr. Applebaum tried to hide his misconduct by deleting files, and by running a defragmentation operations, after he was confronted by Cadence about his theft.

56.  On information and belief, Mr. Applebaum still has improper access to Cadence Trade Secret Information to this date.

57.  On information and belief, if Mr. Applebaum is not enjoined, he will continue to access, use, disclose, or otherwise misappropriate Cadence Trade Secret Information to benefit himself and potentially his new employer, and to unlawfully compete with Cadence.

58.  Mr. Applebaum's misappropriation of Cadence Trade Secret Information has caused and continues to cause substantial injury to Cadence's business and reputation, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution of the value of its trade secrets. Mr. Applebaum has been unjustly enriched by his misappropriation of Cadence's Trade Secret Information. Further, Mr. Applebaum's decision to delete files and hide his traces means that Cadence is without knowledge of the full extent of Mr. Applebaum's misappropriation and has been unable to take steps to mitigate the extent of the injury caused by Mr. Applebaum.

59.  The Cadence Trade Secret Information misappropriated by Mr. Applebaum was compiled after many years of work and significant financial investment. It derives independent economic value from not being generally known to the public or to other persons who can obtain

economic value from its disclosure or use. For example, several of the files contain information related to Cadence's highly confidential pricing, sales strategies, customer accounts, and tailored product offerings. This type of information is not generally known or publicly available and would be highly valuable to a competitor because a competitor would be able to discern Cadence's pricing and sales strategies, target specific Cadence existing customers or prospective customers, offer competitive solutions, and directly underbid Cadence to obtain the sale. The vast majority of the information relating to sales strategies and customer accounts takes years to develop. Having access to such information—in addition to Cadence's highly confidential pricing and tailored product offerings—would give a competitor a tremendous head start on prospective new customers and a roadmap for how to immediately and effectively win business from Cadence from existing customers. For this reason, access to this type of information is strictly controlled.

60. Cadence has taken reasonable efforts to preserve the confidentiality of its Trade Secret Information. Those measures include the implementation of IT tools that block and/or monitor and log the transfer of files, confidentiality agreements, employment policies, and other measures outlined above at paragraphs 18–24.

61. Mr. Applebaum's misappropriation of Cadence Trade Secret Information has directly and proximately caused damage to Cadence and its business. Cadence is therefore entitled to an award of actual damages in an amount to be proven at trial.

62. Because Mr. Applebaum's misappropriation of Cadence's Trade Secret Information has been conducted in a willful and malicious manner, Cadence is entitled to exemplary damages in an amount not exceeding twice the award of damages as well as its attorneys' fees.

63. At all times, the above described actions have caused and are continuing to cause irreparable injury to Cadence, for which Cadence has no adequate remedy at law, and will continue to cause irreparable injury unless enjoined.

64. Cadence is entitled to injunctive relief against Mr. Applebaum to prevent further damage and harm to Cadence.

## THIRD CAUSE OF ACTION

### Breach of Employee Proprietary Information and Inventions Agreement

65. Each of the foregoing paragraphs is incorporated into this Third Cause of Action, as if set forth herein.

66. On July 8, 2014, during his employment at Cadence, Mr. Applebaum executed the EPIIA that obligated him to "keep in confidence and not use for any purpose other than the performance of [their] duties to the Company, or disclose to third parties without [Cadence's] consent, any Proprietary Information." EPIIA, § 2.5. The EPIIA was supported by adequate consideration, namely his continued employment with Cadence.

67. Cadence performed its material obligations under the EPIIA.

68. Mr. Applebaum breached the EPIIA when he transferred Cadence Proprietary Information from his work laptop to his personal laptop, as well as when he transferred documents containing such information to the Seagate drive and then accessed them after his termination as a Cadence employee. Moreover, Mr. Applebaum breached the EPIIA because he did not return the materials containing the Cadence Proprietary Information to Cadence upon leaving the company. Indeed, he already conceded that he breached the EPIIA in his December 18, 2023 signed statement.

69. Upon information and belief, Mr. Applebaum's breaches of the EPIIA are ongoing.

70. Mr. Applebaum's breaches of the confidentiality agreements with Cadence have caused and continue to cause damage to Cadence, including damage to Cadence's reputation and Cadence's loss of its competitive edge in the industry.

71. Cadence will continue to suffer harm unless Mr. Applebaum is temporarily and preliminarily enjoined from further breaches of the confidentiality agreements during this action and permanently after this action. Cadence further seeks its actual damages in an amount to be proven at trial and to both pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cadence Design Systems, Inc. prays for judgment in its favor and against Defendant Jeffery Applebaum, as follows:

A. For temporary and permanent injunction against Mr. Applebaum, including enjoining Mr. Applebaum from violating his legal and contractual duties to Cadence, enjoining Mr. Applebaum from accessing, using, disclosing, or otherwise misappropriating Cadence's confidential and trade secret documents and information, and directing Mr. Applebaum to return all of Cadence's confidential and trade secret documents and information in his possession, custody, or control;

B. For damages as described in each of the above causes of action;

C. For punitive damages against Mr. Applebaum and in favor of Cadence in an amount to be determined at trial;

D. For costs, attorney's fees, and other expenses incurred in this action;

E. For pre-judgment and post-judgment interest; and

F. For such other relief as the Court may deem just and proper.

## JURY DEMAND

Cadence respectfully requests a jury trial on all claims for relief.

DATED: January 16, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____
L. Kieran Kieckhefer

*Attorneys for Plaintiff*