1 | L. KIERAN KIECKHEFER, SBN 251978
   kkieckhefer@gibsondunn.com
2 | JOSEPH A. GORMAN, SBN 267553
   jgorman@gibsondunn.com
3 | CHRISTINA MYROLD, SBN 324183
   cmyrold@gibsondunn.com
4 | GIBSON, DUNN & CRUTCHER LLP
   One Embarcadero Center, Suite 2600
5 | San Francisco, CA 94111-3715
   Telephone: 415.393.8200
6 | Facsimile:  415.393.8306

7 | ILISSA SAMPLIN, SBN 314018
   isamplin@gibsondunn.com
8 | GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
9 | Los Angeles, California 90071-3197
   Telephone:    213.229.7000
10 | Facsimile:    213.229.7520

11 | AHMED ELDESSOUKI, *pro hac vice forthcoming*
    aeldessouki@gibsondunn.com
12 | GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
13 | New York, NY  10166-0193
    Telephone:    212.351.4000
14 | Facsimile:    212.351.4035

15 | *Attorneys for Plaintiff*
    *CADENCE DESIGN SYSTEMS, INC.*



**FILED**

**JAN 16 2024**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION



CADENCE DESIGN SYSTEMS, INC., a
Delaware corporation,

        Plaintiff,

  v.

JEFFREY APPLEBAUM,

        Defendant.

Case No.  **C 24 00290**

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, EVIDENCE PRESERVATION AND LIMITED SEIZURE ORDER, EXPEDITED DISCOVERY ORDER, PROTECTIVE ORDER, AND OSC RE: PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT**

**(FILED UNDER SEAL)**

Gibson, Dunn &
Crutcher LLP

---

Plaintiff Cadence Design Systems, Inc. ("Cadence") respectfully submits this *Ex Parte* Application for a Temporary Restraining Order ("TRO") without notice against Defendant Jeffrey Applebaum, which includes as part of the TRO a request for an Evidence Preservation Order, Limited Seizure Order, Expedited Discovery Order, Protective Order, and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

This *Ex Parte* Application is based upon the Memorandum of Points and Authorities set forth below, the concurrently filed Declarations of L. Kieran Kieckhefer, Erik Hammerquist, Paul Scannell, William Gee, Jennifer Williamson, and the exhibits attached thereto, as well as the other papers and pleadings on file in this action.

## I.    INTRODUCTION

Cadence is an industry leading computational software company that produces software, hardware, and silicon structures for designing integrated circuits, systems on chips, and printed circuit boards.  Until mid-December 2023, Mr. Applebaum was a Senior Account Executive at Cadence, responsible for sales of Cadence products to over 60 of the world's leading technology and semiconductor companies.  *See* Declaration of Jennifer Williamson ("Williamson Decl.") ¶ 2; Declaration of Paul Scannell ("Scannell Decl.") ¶ 2.  Mr. Applebaum graduated from Massachusetts Institute of Technology (MIT) with a Bachelor of Science and a Master of Science in Electrical Engineering in 1990 and joined Cadence in March 2006. *See* Williamson Decl. ¶ 2. He left Cadence to join a competitor (although when asked, he refused to tell Cadence the name of the competitor). *Id.* ¶ 4. The sequence of events leading up to, and following, his last day at Cadence has revealed that Mr. Applebaum stole a massive amount of Cadence's proprietary and trade secret data and engaged in a disturbing pattern of sophisticated steps to hide his misconduct and outright lie about it once caught.

Cadence only recently became aware of the extent of Mr. Applebaum's misconduct and the fact that *he still has possession of a device containing Cadence's proprietary information and trade secrets to this day, despite swearing under penalty of perjury that he does not.* Cadence urgently needs the Court's assistance now, to put a stop to Mr. Applebaum's unlawful and deceptive behavior, which includes the following:

*Lie #1: Exit Interview.*  On December 10, 2023, Mr. Applebaum signed an Exit Interview

Schedule, confirming that he had returned to Cadence all Cadence documents, data, and records. *Id.* ¶ 7, Ex. 4. This was a lie, as it was later discovered on December 14 that he had transferred a massive amount of Cadence proprietary material to his personal laptop. Declaration of William Gee ("Gee Decl.") ¶ 4.

*Evasive Tactic #1: Network Transfer to Bypass IT Restrictions.* On December 14, 2023, Cadence IT discovered as a result of a manual check of Mr. Applebaum's activity that he had transferred massive quantities of Cadence documents (107,000 files) from his work laptop to his personal laptop one month earlier, on November 18. *Id.* Mr. Applebaum did not transfer the files using a flash drive—because he knew, from his many years at the company, that it would have been detected, logged, and blocked by the Digital Guardian Software and associated restrictions built into Cadence computers. *See id.* ¶ 3. Instead, using his technical skills and sophistication, Mr. Applebaum realized that he could bypass IT security restrictions designed to block such transfers by transferring files using a home network. *Id.* ¶ 4. To the best of Cadence's knowledge, no one at Cadence has ever bypassed its IT security protections like this before.

*Lie #2: He Only Transferred Personal Materials.* Upon discovering the massive theft, on December 15, 2023, Cadence's HR staff and in-house counsel immediately confronted Mr. Applebaum by phone. Williamson Decl. ¶ 8. Initially, he falsely told them that the transfer included only personal materials relating to his comedy career (he moonlights as a standup comic). *Id.* When he was told that Cadence had records showing otherwise, he became quiet, and did not deny stealing Cadence's proprietary material. *Id.*

*Lie #3: Promise Not to Delete.* On that December 15 phone call, Cadence also asked Mr. Applebaum to come into the office the following Monday, December 18 with his personal laptop. Cadence expressly asked him not to touch, delete, or manipulate any files on his laptop over the weekend. *Id.* He acknowledged and agreed. *Id.* A later forensic analysis showed that, contrary to this promise, Mr. Applebaum extensively accessed and deleted a vast amount of material over that weekend. Gee Decl. ¶¶ 5-6; Declaration of Erik Hammerquist ("Hammerquist Decl.") ¶¶ 6(c), (d), 15.

*Evasive Tactics #2 and #3: Destruction of Evidence and Defragmentation.* In addition to showing that he deleted a number of the transferred documents from his personal laptop over the

weekend, the later forensic analysis also showed that Mr. Applebaum tried to hide his tracks by running a defragmentation utility hours before meeting with Cadence on December 18. Alarmingly, and demonstrating Mr. Applebaum's sophistication in orchestrating this theft, the defragmentation utility runs a process that purges data blocks not in "use," including blocks that previously stored deleted files. Hammerquist Decl. ¶¶ 6(e), 16. The only possible purpose of running a defragmentation hours before meeting with Cadence on his drive would be to attempt to conceal metadata on that device. *Id*. In other words, Mr. Applebaum went to great lengths over the weekend to conceal his misconduct, and demonstrated his technical acumen in doing so.

*Lie #4: Under Penalty of Perjury Swearing He No Longer Had Cadence Materials*. Mr. Applebaum returned to Cadence on Monday, December 18 with his personal laptop. Gee Decl. ¶ 5. Cadence imaged the laptop and then deleted the Cadence proprietary materials from it. *Id*. In addition, he signed a sworn declaration, under penalty of perjury, admitting that he had transferred 107,000 Cadence proprietary files in violation of multiple agreements, including his Employee Proprietary Information and Inventions Assignment Agreement (EPIIAA) and his exit agreement. Gee Decl. ¶ 7, Ex. 2. Specifically, he declared that he had stolen the following categories of proprietary information:

- Thousands of files containing information about Cadence customers including Synaptics, Lattice, Samsung, Monolithic Power Systems, among others.
- Over a thousand files with internal information about Cadence products.
- A copy of an internal Cadence directory containing account information and other information relating to dozens of additional Cadence customers.
- A copy of tens of thousands of files from his 'appdata' directory on his work laptop;
- Multiple Microsoft Outlook '.pst' export files each containing 44.5 GB of data.

*Id*.

He also swore that he did not have any Cadence materials on any other devices. *Id*. This turned out to be an outright lie, however, as later forensic analysis showed that Mr. Applebaum had *also* transferred Cadence proprietary materials to *another* device, a Seagate USB Drive (hereinafter "Seagate Drive"). *See* Hammerquist Decl. ¶¶ 6(b), 15.

*Lie #5: Assuring Cadence He Had No Cadence Materials*. On December 18, Mr. Applebaum

came into Cadence's office and lied face-to-face to Cadence's Director of IT and in-house legal counsel by representing that he did not transfer Cadence materials to any devices other than his personal laptop. Gee Decl. ¶ 7. This false statement was no oversight—indeed, later forensic analysis showed that Mr. Applebaum was accessing files on the Seagate Drive just hours before he made these misrepresentations (*i.e.*, around 1:00 a.m. on December 18). *Id.* ¶¶ 6(d), 16.

*Forensic Analysis Reveals One Bad Act After Another.* Cadence had believed Mr. Applebaum and thought any harm caused by his theft was fixed by (1) the return and deletion of Cadence's proprietary information, (2) the sworn affidavit, and (3) Mr. Applebaum's face-to-face confirmations to people he had worked with for years that he had no additional Cadence proprietary information. However, given the scale of Mr. Applebaum's theft, the proprietary nature of the stolen materials, and the value of the information to Cadence, Cadence promptly hired outside counsel and a third-party forensics firm to conduct a detailed forensic analysis of his imaged personal laptop. This forensic analysis revealed a shocking and complicated pattern of lies and efforts to hide his conduct, including that: (1) he transferred 107,000 files containing Cadence proprietary information from his work laptop to his personal laptop on November 18 using a network transfer to bypass IT restrictions—which he lied about on the December 15 phone call and later admitted in his sworn declaration; (2) he deleted materials from his personal laptop over the weekend despite promising not to do so during the December 15 phone call; (3) he ran a defragmentation process over the weekend before the December 18 meeting to hide his tracks; (4) he lied in his sworn statement when he averred that he did not have Cadence materials on other devices; (5) he lied in person when asked on December 18 if he had Cadence materials on other devices, even though he had been accessing those devices hours earlier, in the middle of the night.

*Mr. Applebaum Is Still In Possession of Cadence Proprietary and Trade Secret Materials.* On January 3, 2024, Cadence and the forensic team confirmed that, despite his sworn statement and face-to-face lies to the contrary, Mr. Applebaum is still in possession of Cadence trade secrets and other proprietary material on his Seagate Drive, which he never disclosed to Cadence. Hammerquist Decl. ¶¶ 6(b), 15; Gee Decl. ¶ 8. Specifically, the forensics revealed that the files transferred to the Seagate Drive include a folder titled "AX," which contained trade secrets concerning Cadence products, pricing

methodologies, product configurations for specific Cadence customers, and specific license terms between Cadence and its customers. Hammerquist Decl. ¶¶ 6(b), 15.

The most plausible reason for Mr. Applebaum to steal these materials, hide his tracks, lie about it under oath, and maintain possession of a secret device, would be to help himself while at a Cadence competitor.[1]  The materials would be of no use to Mr. Applebaum unless he was planning to use the information contained therein to unfairly compete with Cadence for the benefit of himself at his new employer, who Mr. Applebaum refused to identify but described as a "competitor" of Cadence.

A TRO is necessary here to prevent the irreparable harm to Cadence that will ensue from Mr. Applebaum's theft and use of Cadence's proprietary materials.  This TRO does not seek to stop Mr. Applebaum from *lawfully* competing.  However, preliminary injunctive relief is necessary when there has been intentional theft of competitive, proprietary information, as here.  Mr. Applebaum should be required to return the stolen files (including on his Seagate Drive) and he should be enjoined from reviewing and using Cadence's proprietary information in any way.  Additionally, Mr. Applebaum should be required to turn over his electronic devices, servers, and cloud storage accounts for forensic analysis to determine the full extent of his misappropriation and misconduct.

Cadence brings this application *ex parte* and without notice because, in light of his sophisticated, massive, and surreptitious theft, it is likely that Mr. Applebaum will seek to delete evidence of his malfeasance, leaving Cadence unable to determine the extent of dissemination and scope of harm.  Indeed, he already brazenly defied company policy and contractual obligations (as he admitted), and tried to hide his conduct from Cadence on multiple occasions.  Thus, it is anticipated that Mr. Applebaum would seek to further cover his tracks (or worse, further distribute Cadence competitive and proprietary materials) upon learning of this application prior to the Court issuing a TRO.  Mr. Applebaum is an incredibly sophisticated actor who has evaded detection in the past. Cadence continues to learn over time more and more pieces of his misconduct, and needs the Court to intervene to protect the company's competitive and proprietary information.

---

[1] While Mr. Applebaum indicated that he was going to work at an unidentified Cadence competitor, on information and belief, Cadence understands that he may not have yet started his new job.  Williamson Decl. ¶ 10.  Thus, Cadence respectfully requests that the Court grant an expedited TRO to prevent Mr. Applebaum from taking Cadence proprietary information in his possession to the competitor.

Gibson, Dunn &
Crutcher LLP

In addition, Cadence requests an evidence preservation order and a seizure order requiring the immediate seizure of Mr. Applebaum's Seagate Drive, and other devices and accounts, to prevent further destruction of evidence. Such orders are highly warranted in situations like this one, where Mr. Applebaum already conceded he *stole* massive amounts of Cadence proprietary materials before heading out the door to a competitor, made *multiple copies* of the materials, *lied* about the theft, copying, and deletion on multiple occasions, *deleted* evidence after being told not to, and attempted at every turn to *hide* his tracks. Cadence is deeply concerned that if Mr. Applebaum deletes more information, Cadence will have no idea whether he has already transferred its proprietary information or to whom such information was sent, resulting in irreparable and irreversible harm to Cadence's business. This is the quintessential case for emergency relief.

## II.   FACTS

The facts relevant to this application, appearing more fully in the accompanying declarations, are as follows.

### A.   Cadence Is a Market Leader that Generates Valuable Proprietary and Trade Secret Information

Cadence is a market leader that produces software, hardware, and silicon structures for designing integrated circuits, systems on chips, and printed circuit boards. Compl. ¶¶ 3, 15. Cadence customers are the world's most innovative companies, delivering extraordinary products from chips to systems, chemicals to drugs, and specification to manufacturing for the most dynamic market applications, including hyperscale computing, 5G communications, automotive, mobile, aerospace, consumer, industrial, and life sciences. *Id.* ¶¶ 3, 7-14.

Cadence takes the protection of its proprietary and trade secret information and documents seriously, and has invested in technological, physical, and contractual measures to limit access to its sensitive confidential and trade secrets by employees and by third parties. Scannell Decl. ¶¶ 5-6. Cadence's proprietary and trade secret documents are generally restricted to groups that require access to the information. *Id.* ¶ 6. For instance, many documents that contain proprietary and trade secret customer information are restricted to Cadence's sales division. *Id.* Further, Cadence uses Digital Guardian, which is an industry leading data protection solution that monitors Cadence's sensitive,

proprietary, and trade secret data.  Gee Decl. ¶ 3.  Through this software program, Cadence is able to track, audit, and log transfers or threats to such information.  *Id.*

**B.    Mr. Applebaum Misappropriated Cadence's Proprietary Materials**

**1.    Mr. Applebaum had access to proprietary materials and was obligated to keep them confidential**

Mr. Applebaum began working for Cadence in March 2006.  Williamson Decl. ¶ 2.  As part of his job, he was extensively involved with existing and prospective customers throughout the sales cycle.  Scannell Decl. ¶ 2.  He worked with Cadence customers to identify specific Cadence software and modules that the customers needed and the appropriate pricing for the software, recommend and facilitate solutions and proposals, and assist in delivering Cadence's products and services.  *Id.*

In this role, he had access to critical information related to Cadence's sales strategy and methodology, product design and future product plans, product pricing and customer pricing, Cadence's overall financials, its business plans, and other confidential and proprietary information. Scannell Decl. ¶¶ 4, 6-10.  Because of this, and consistent with Cadence's policies, Mr. Applebaum signed an Employment Proprietary Information and Inventions Agreement ("EPIIA") on July 8, 2014. Williamson Decl. ¶ 3, Ex. 2.  By signing the EPIIA, Mr. Applebaum agreed:

- to "hold in the strictest confidence ... the Company's Proprietary Information;"
- "all Proprietary Information shall be the sole property of the Company and its assigns;"
- "to keep in confidence and not use for any purpose other than the performance of my duties to the Company ... any Proprietary Information or Company Inventions;"
- upon leaving the Company, to "deliver to either my manager or the Company's legal department: (a) all drawing, notebooks, notes, memoranda, source code, specifications, devices, formulas, records, manuals, reports and documents, together with all copies thereof in my possession, custody or control; (b) all Company Records and any other material(s), including emails hard and soft copy documents, containing or disclosing any Company Inventions, Third Party Information or Proprietary Information in my possession, customer or control; and (c) all Company property or Company equipment in my possession, custody or control."

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

Gibson, Dunn & Crutcher LLP

*Id.* at Sections 1.1, 2.5, 4. Under the EPIIA, "Proprietary Information" includes "any and all confidential and/or proprietary knowledge, data or information belonging to the Company" including "customer and vendor lists, contacts, plans, and agreements with customers, vendors, and others," "information relating to products, processes, know-how," "information regarding ... new products, ... licenses, prices and costs, suppliers and customers," and "program and product designs." *Id.* at § 1.2.

Mr. Applebaum also acknowledged and signed Cadence's Employee Handbook ("Handbook"), which further advises that "[o]n termination of employment ... all tangible and intangible Cadence property must be returned to the Company immediately," and the "terminating employee must immediately notify the Company if the employee has confidential information stored in the employee's personal computer, or other storage medium." *See id.* ¶ 2, Ex. 1, Ex. 3 at 6. It also states "no proprietary information belonging to Cadence or its customers may be transferred, copied, or sent through the system without prior written authorization from your manager." *Id.* Ex. 3 at 7.

### 2. Cadence uncovers that Mr. Applebaum conducted massive theft of Cadence's proprietary information and lied about it

Mr. Applebaum gave notice that he was leaving Cadence on December 8, 2023, with his last day being December 15. *Id.* ¶ 4. He stated that he was leaving to join a competitor, but when asked, he declined to state which competitor. *Id.* In light of this, and consistent with Cadence's policies, Cadence's Human Resources Director notified Cadence's Legal and IT Departments, and requested that his accounts be monitored for suspicious activity. *Id.* ¶ 6. That same day, Bhupendra Sonkusare from Cadence's IT Department investigated Mr. Applebaum's IT activity. Gee Decl. ¶ 4.

On December 10, 2023, Mr. Applebaum signed an Exit Interview Schedule, confirming that he had returned all Cadence documents, data, and records. *See* Williamson Decl. ¶ 7, Ex. 3 at 3 ("I acknowledge that I have returned to Cadence all such copies of any Cadence materials which are or have been in my possession, control, or custody ....").

However, on December 14, 2023, Cadence's Director of IT noticed that Mr. Applebaum had transferred a significant amount of information from his work laptop to his personal laptop, including approximately 107,000 files in one transfer. Gee Decl. ¶ 4. Mr. Applebaum had somehow figured out a way to bypass the software on his work laptop that restricts file transfers to external devices, which

1    is something that, to the best of Cadence's knowledge, has never been done before. *Id.*

2    Importantly, Mr. Applebaum's file transfers occurred less than three weeks prior to the date on

3    which Mr. Applebaum gave notice. It is highly reasonable to believe that, at the time Mr. Applebaum

4    performed the transfers, he knew he would be leaving to go to the competitor. Williamson Decl. ¶ 9.

5    Immediately after realizing that the transfer was not legitimate, Cadence contacted Mr. Applebaum via

6    phone call on December 15. *Id.* ¶ 8. At first, Mr. Applebaum stated that he had only copied personal

7    files, but when told that Cadence knew that was inaccurate because it had records of what was

8    transferred, he became quiet, and did not deny that he had stolen proprietary material. *See id.* Cadence

9    instructed Mr. Applebaum not to delete any files from his personal laptop, and asked that he provide

10   his personal laptop to Cadence on Monday, December 18. *Id.* Mr. Applebaum agreed. *Id.*

11
12
### 3.   Mr. Applebaum bypassed state of the art data protection technology to steal Cadence's proprietary information

13   Mr. Applebaum's sophistication in effectuating his theft is remarkable. Cadence employs and

14   loads Digital Guardian Software ("DGS") on all Cadence employee computers, including Mr.

15   Applebaum's work laptop. Gee Decl. ¶ 3. Digital Guardian is a data protection platform that logs data

16   transfers and other activities on a user's computer and blocks unauthorized data transfers. *Id.*

17   While Mr. Applebaum's transfers were logged by DGS, his transfers were not blocked because

18   he had discovered a way to bypass IT security restrictions—namely, creating a file transfer between

19   his work computer and personal computer on his home network—something that would have ordinarily

20   been blocked and flagged on the Cadence network. *Id.* ¶ 4. While the large transfer was logged, it was

21   not flagged due to this creative and sophisticated work around. *Id.* Whenever an employee resigns

22   and states that they will go to a competitor, Cadence initiates a manual review the employee's files,

23   devices, and information to confirm that no Cadence proprietary information has been stolen.

24   Williamson Decl. ¶ 6. Cadence realized the massive and unauthorized file transfers because, due to

25   normal procedure, Cadence initiated a manual review of Mr. Applebaum's work laptop given he stated

26   he was going to a competitor. *Id.* ¶¶ 6, 8. Despite having conducted hundreds of manual reviews over

27   the years, Cadence is not aware of someone at Cadence ever having bypassed Cadence IT security

28   protections like this before. Gee Decl. ¶ 4.

Gibson, Dunn &
Crutcher LLP

9

#### 4. Mr. Applebaum admits to stealing Cadence proprietary material in violation of his agreements and swears that he no longer has such materials

On Monday, December 18, Mr. Applebaum brought his personal laptop to Cadence. Cadence's Director of IT created an image of the device and then instructed Mr. Applebaum to delete all remaining Cadence files on it in his presence. Gee Decl. ¶ 5. He was asked face-to-face whether he had transferred any Cadence proprietary materials to *other* devices, and he stated that he had not. *Id.* ¶ 7. Cadence therefore believed it understood the scope of the issue at the time. It was not until later that forensic analysis showed Mr. Applebaum's representation that had not transferred Cadence proprietary materials to other devices be a lie. *See infra* pp. 11-13; Gee Decl. ¶ 8.

Mr. Applebaum also signed a statement—***under penalty of perjury***—describing his conduct. *See* Gee Decl. ¶ 7, Ex. 2 (hereinafter "Applebaum Affidavit"). In the Applebaum Affidavit, Mr. Applebaum admitted that he had uploaded and transferred 107,000 files in violation of his employment agreements. Specifically, he averred to the following:

- "Cadence entrusted me with Cadence property and information, including Confidential Information (as designed by my Employee Proprietary and Inventions Agreement ('EPIIA') that I signed on July 8, 2014."

- "On my last day of work at Cadence, I executed an Employee Exit Acknowledgement and other exit documents in which I stated that I did not have in my possession any Cadence property or information, including Confidential Information. However, in the month prior to my termination of employment … I uploaded files from my Cadence-assigned laptop to my personal laptop and still had possession, control, and/or custody of the files as of my termination date."

- "Specifically, on or about November 18, 2023, I transferred approximately 107,000 files from my Cadence laptop to my personal laptop. The files included Cadence confidential information including:
  - Thousands of files containing information about Cadence customers including Synaptics, Lattice, Samsung, Monolithic Power Systems, among others.
  - Over a thousand files with internal information about Cadence products.

        o  A copy of an internal Cadence directory containing account information and other information relating to dozens of additional Cadence customers.

        o  A copy of tens of thousands of files from my 'appdata' directory on my Cadence-assigned laptop;

        o  Multiple Microsoft Outlook '.pst' export files each containing 44.5 GB of data."

*Id.*

In addition, Mr. Applebaum acknowledged that his "failure to return such property and Confidential Information was a severe breach of the EPIIA and Separation Agreement." *Id.*

He further swore under penalty of perjury that he had "thoroughly reviewed all [his] devices" and affirmed that he did "not have any Cadence property or information" and did not "have access to any such Confidential Information." *Id.* He also swore that he had not "transferred" or made "any recreations, copies, modifications or other versions of such files." *Id.* Both of these statements were later proven false by the forensic analysis.

### 5.    Forensic analysis reveals that Mr. Applebaum concealed additional misappropriation and lied about it

Promptly after the December 18, 2023 meeting, Cadence retained an outside forensics firm (FTI) to conduct a forensic analysis of Mr. Applebaum's devices to confirm Cadence had caught the issue in time and stopped the harm. On December 26, 2023, FTI received the image of Mr. Applebaum's personal laptop. Hammerquist Decl. ¶ 11. Two days later, on December 28, 2023, FTI provided an initial red flag that Mr. Applebaum may have transferred Cadence material to *another* device beyond the personal laptop—*i.e.*, a device that did not appear to have yet been disclosed to Cadence, and, therefore, was not covered by the Applebaum Affidavit. *Id.* On January 3, 2024, Cadence learned that, despite Mr. Applebaum being told that he had been caught on December 15 and purporting to come clean on December 18, Mr. Applebaum had, in fact, engaged in additional extensive theft that was not yet disclosed to Cadence and, worse, Mr. Applebaum still retained possession of proprietary and highly confidential Cadence information. Gee Decl. ¶ 8. The details are as follows:

First, Mr. Applebaum did not just transfer documents to his personal laptop; he also transferred Cadence proprietary documents to the Seagate Drive, an external USB device. Hammerquist Decl.

Gibson, Dunn &
Crutcher LLP

11

¶¶ 6(b), 15. Mr. Applebaum did not disclose this additional device, which is still in his possession, and outright lied to Cadence when they asked on December 18 if he had transferred material to other devices. *See* Gee Decl. ¶ 7, Ex. 2. Although the forensic evidence that Cadence was able to obtain does not provide a full accounting of the files that Mr. Applebaum copied to the Seagate Drive, the evidence shows that Mr. Applebaum transferred files, including from a folder titled "AX," which contained trade secrets concerning Cadence products, pricing methodologies, product configurations for specific Cadence customers, and specific license terms between Cadence and its customers. Hammerquist Decl. ¶¶ 6(b), 15; Scannell Decl. ¶¶ 6-10.

Second, after being confronted on the December 15 call, Mr. Applebaum deleted files from the personal laptop he did turn over on December 18, despite being asked not to during the December 15 phone call. Gee Decl. ¶¶ 5-6; Williamson Decl. ¶ 8. Thus, as of now, Cadence is in the dark about the extent to which Mr. Applebaum transferred documents to his personal laptop (because he deleted them) and the Seagate Drive (because he has it and never disclosed its existence or turned it over).

Third, the forensic analysis also revealed that Mr. Applebaum tried to hide his tracks by running a defragmentation utility over the weekend that purges data blocks not in "use," including blocks that previously stored deleted files. Hammerquist Decl. ¶¶ 6(e), 16. The only reason for him to run the defragmentation process on his laptop would be to attempt to conceal metadata on that device. *Id.*

Fourth, the analysis also showed that he accessed his Seagate Drive files in the middle of the night the day he returned his personal laptop to Cadence (December 18, 2023). *Id.* ¶¶ 6(c), 15. This demonstrates that his lies on December 18 were no oversight—he had been actively engaging with a device *that day* yet lied about it—in a sworn statement and in discussions with Cadence. *See* Gee Decl. ¶¶ 7-8, Ex. 2.

### C. Cadence Acted Diligently In Pursuing Relief Despite Mr. Applebaum's Conduct

Notwithstanding Mr. Applebaum's destruction of evidence and repeated lies, Cadence acted diligently in seeking this relief:

- December 18, 2023: Mr. Applebaum allows Cadence to image his personal laptop, and he signs a sworn declaration averring that he had turned over all devices with Cadence proprietary information and no more Cadence proprietary information remained in his possession, custody

1    or control. *Id.* ¶ 7, Ex 2.

2    •   December 19-23, 2023: Notwithstanding the sworn declaration, Cadence works to secure

3        outside legal counsel (Gibson Dunn) and an outside forensic firm (FTI) to confirm there is no

4        remaining risk to Cadence proprietary and confidential information. Hammerquist Decl. ¶¶ 5,

5        11.

6    •   December 26, 2023: FTI receives the image of Mr. Applebaum's personal laptop. *Id.* ¶ 11.

7    •   December 28, 2023: FTI's initial forensic analysis shows that Mr. Applebaum may have

8        transferred Cadence material to *another* device, beyond the personal laptop. *Id.*

9    •   January 3, 2024: Cadence learns that the new device was a Seagate Drive that had not been

10       previously disclosed to Cadence, either on December 18 or otherwise. Gee Decl. ¶ 8.

11   •   January 16, 2024: Cadence files this *Ex Parte* TRO and related paperwork and requested

12       orders.

13                            **III.    LEGAL STANDARD**

14       "The standard for issuing a temporary restraining order is identical to the standard for issuing a

15   preliminary injunction." *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at

16   *2 (N.D. Cal. Mar. 15, 2018). A plaintiff "must establish that he or she is likely to succeed on the

17   merits, that he or she is likely to suffer irreparable harm in the absence of preliminary relief, that the

18   balance of equities tips in his or her favor, and that an injunction is in the public interest." *Id.* at *2

19   (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As set forth below, this standard

20   is easily met here. *See id.* at *5 ("Plaintiff's concerns [regarding irreparable harm] are justifiably

21   heightened because of … Defendant's false representations to Plaintiff during Defendant's exit

22   interview.").

23       A court may issue a temporary restraining order *ex parte*, without notice, where the moving

24   party establishes that "specific facts in an affidavit or a verified complaint clearly show that immediate

25   and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard

26   in opposition." Fed. R. Civ. P. 65(b)(1)(A). *Ex parte* orders are proper in cases where "notice to the

27   defendant would render fruitless the further prosecution of the action." *Reno Air Racing Ass'n, Inc. v.*

28   *McCord*, 452 F.3d 1125, 1131 (9th Cir. 2006); *Shutterfly, Inc. v. ForeverArts, Inc.*, 2012 WL 2911887,

at *4 (N.D. Cal. 2012) (granting *ex parte* TRO where "defendant ignored signed obligations regarding the [misappropriated trade secrets] at issue").

## IV.    ARGUMENT

### A.    The TRO Factors Overwhelmingly Favor Granting Relief Here

Cadence respectfully requests a TRO prohibiting Mr. Applebaum from disclosing, using, accessing, distributing, modifying, moving, or deleting any Cadence proprietary and confidential material or trade secrets; and requiring Mr. Applebaum to turn over his Seagate Drive and other devices to Cadence. As explained below, all four TRO factors overwhelmingly favor granting the TRO here.

#### 1.    Cadence is likely to succeed on the merits of its claims

In its Complaint, Cadence has alleged breach of contract, as well as misappropriation of trade secrets under both the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3246 *et seq.* ("CUTSA").  Cadence is likely to succeed on these claims.

##### a.    Breach of contract

Cadence alleges that Mr. Applebaum breached the EPIIA, which he signed on July 8, 2014 (*see* Williamson Decl. ¶ 3, Ex. 2), when he transferred Cadence proprietary materials from his work laptop to his personal laptop, as well as when he transferred documents to the Seagate Drive, including because he did not return Cadence proprietary materials to Cadence upon leaving the company.  Mr. Applebaum already conceded that he breached the EPIIA in his December 18, 2023 signed statement. *See* Gee Decl. ¶ 7, Ex. 2 (acknowledging that his "failure to return such property and Confidential Information was a severe breach of the EPIIA and Separation Agreement"); *see also Edwards Lifesciences Corp. v. Launey*, 2023 WL 4680774, at *4–5 (C.D. Cal. June 12, 2023) (finding that "likelihood of success on the merits" on breach of contract claim where "Defendant transmitted confidential information to himself prior to leaving the company" in violation of his employment agreement).  For the same reasons, when Mr. Applebaum failed to return the Cadence proprietary materials on his Seagate Drive, he breached his contract with Cadence. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding likelihood of success  on the merits where defendant "emailed and downloaded, to her personal devices, confidential information … before

Gibson, Dunn & Crutcher LLP

14

leaving her employment to work for a competitor" in violation of her employment agreements).

### b.   Trade secret claims

To prevail on a misappropriation of trade secrets claim under DTSA or CUTSA, a plaintiff must show that (i) it has a protectable trade secret and (ii) a defendant misappropriated that trade secret. *Comet Techs.*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018); *see also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1204 (E.D. Cal. 2020). Both requirements are satisfied here.

First, the stolen information qualifies as trade secret information under both federal and California law.   Under DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information ... whether or how stored, compiled, or memorialized ... if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value form the disclosure or use of the information." 18 U.S.C. § 1893(3).   Under CUTSA, "trade secret" means "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:   (1) Devices independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1.

Here, the stolen material unequivocally includes Cadence's trade secrets.   Mr. Applebaum already admitted that he stole over 107,000 files that include "information about Cadence customers," "internal information about Cadence products," "[a] copy of an internal Cadence directory containing account information and other information relating to dozens of additional Cadence customers," and "files from [his] 'appdata' directory on my Cadence-assigned laptop."   Gee Decl. ¶ 7, Ex. 2.   More specifically, those files include Cadence's highly confidential price books and pricing calculators for Cadence's product and service offerings, Cadence's sales strategies to target specific accounts and geographic territories, Cadence's customer account information and contracts, and Cadence's product offerings and strategies, including specifications, roadmaps, internal design documents, and other technical information.   Scannell Decl. ¶¶ 4, 6.   Cadence thought this highly confidential information

had been returned to Cadence when Cadence caught Mr. Applebaum—but learned after the fact through a forensic analysis that he further copied to the Seagate Drive a folder titled "AX," which contained trade secrets concerning Cadence products, pricing methodologies, product configurations for specific Cadence customers and specific license terms between Cadence and its customers. *Id.* ¶¶ 7-10; Hammerquist Decl. ¶¶ 6(b), 15. Such information would be valuable to competitors in the industry because it would allow a competitor to discern Cadence's pricing and sales strategies, target specific Cadence existing customers or prospective customers, offer competitive solutions, and directly underbid Cadence to obtain the sale. Scannell Decl. ¶ 6. The vast majority of the information relating to sales strategies and customer accounts takes years to develop. *Id.* Having access to such information—in addition to Cadence's highly confidential pricing and tailored product offerings— would give a competitor a tremendous head start on prospective new customers and a roadmap for how to immediately and effectively win business from Cadence from existing customers. *Id.* As described above, Cadence has taken reasonable measures to keep its trade secrets secret, including requiring its employees to sign confidentiality agreements, prohibiting distribution of Cadence's proprietary and trade secret information out of Cadence-approved and password-protected platforms. *See also id.* 5-6.

Second, there is no question that Mr. Applebaum misappropriated these materials. To prove misappropriation under either statute, Cadence need only show that Mr. Applebaum (a) acquired a trade secret by improper means, or (b) disclosed or used without consent a trade secret that was acquired through improper means. 18 U.S.C. § 1839(5). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a duty to maintain secrecy, or espionage or other means …." 18 U.S.C. § 1839(6). For example, in *Comet Techs.*, the court found that the defendant "knew or had reason to know that downloading and removing the [trade secret] information was theft or, at minimum, a breach of Defendant's contractual duty to maintain secrecy" and that if "Defendant was at all unclear about whether taking information was a breach of Defendant's duty to maintain secrecy, the exit interview would have dispelled any doubts." 2018 WL 1990226, at *4.

Here, Mr. Applebaum already admitted to stealing a massive amount of Cadence's proprietary information in violation of the EPIIA, which he stole by using a network transfer from his work computer to his personal computer to evade detection. *See* Gee Decl. ¶ 7, Ex. 2. After he was told on

December 15, 2023 that he had been caught, he signed a declaration on December 18 conceding his misconduct. *Id.*; Williamson Decl. ¶ 8. Since then, the forensic analysis has revealed that he *also* stole Cadence's trade secrets by transferring them to *another* device (the Seagate Drive), and that he lied about that on December 18, as well. Hammerquist Decl. ¶¶ 6(b), 15. In addition, between December 15 and December 18, he further covered his tracks by deleting evidence from his personal laptop, and running a last-minute defragmentation process on that laptop, before turning it over to Cadence. *Id.* ¶¶ 6(d), 16; Gee Decl. ¶¶ 5-6. As a result, it is undisputed that Mr. Applebaum acquired these materials through improper means, thus committing misappropriation. The only question is the extent of his misappropriation.

Worse, Mr. Applebaum accessed Cadence materials (on his Seagate Drive) *after* he was no longer employed by Cadence, as the forensics review demonstrates. *See* Hammerquist Decl. ¶¶ 6(c), 15. And he lied about that post-employment access in a sworn declaration. Gee Decl. ¶ 7, Ex. 2. To date, Cadence still does not know the extent of Mr. Applebaum's conduct because he has not been forthcoming about his behavior. Initially, Mr. Applebaum lied to Cadence about being in possession of any proprietary materials at all. Williamson Decl. ¶ 8. It was only after being confronted with evidence that he admitted to transferring files to his personal laptop. *Id.* But even then, he was not entirely forthcoming, as subsequent forensic analysis revealed the existence of an external hard drive, as well as additional deletion of files. Hammerquist Decl. ¶¶ 6(b), 6(d), 15; Gee Decl. ¶¶ 5-6. This conduct further underscores that Mr. Applebaum knew or had reason to know that he had acquired and disclosed Cadence's trade secrets in violation of his contractual duty to maintain the secrecy of Cadence's trade secrets.

Numerous courts in the Ninth Circuit have found likelihood of success on DTSA and CUTSA claims based on far less egregious facts, where a defendant transferred his employer's confidential information before leaving the employer to work for a competitor, and the defendant had signed a confidentiality agreement. *See, e.g., Comet Techs.*, 2018 WL 1990226; *Henry Schein*, 191 F. Supp. 3d at 1077; *OOO Brunswick Rail Mgmt. v. Sultanov*, 2017 WL 67119 (N.D. Cal. Jan. 6, 2017); *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2019 WL 2177262 (C.D. Cal. May 20, 2019); *Earthbound Corp. v. MiTek USA, Inc.*, Dkt. No. 154 (C.D. Cal. Feb. 10, 2017).

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

### 2.    Cadence will be irreparably harmed absent a TRO

Cadence will be irreparably harmed absent a TRO. "An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Cutera, Inc.*, 444 F. Supp. at 1208 (citation omitted).   "California courts have presumed irreparable harm when proprietary information is misappropriated." *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254, at *8 (N.D. Cal. Mar. 18, 2010).

Here, Mr. Applebaum has already taken numerous steps to deceive Cadence, indicating an intent to distribute the proprietary material he unquestionably stole. Mr. Applebaum stole and still retains on his Seagate Device some of Cadence's most sensitive and important materials. Hammerquist Decl. ¶¶ 6(b), 15; Scannell Decl. ¶¶ 6-10.   Mr. Applebaum very likely also retained hard copy documents that also contain Cadence's proprietary materials, in addition to files on his personal email accounts.   This information is incredibly valuable, not generally known or publicly available, and would allow a competitor or someone working for a competitor to have an incredible competitive advantage over Cadence. *Id.* ¶ 6. Mr. Applebaum also already admitted that he is pursuing employment with a competitor. Williamson Decl. ¶ 4. Given his experience level, in his new role, he will likely be uniquely positioned to make decisions and create and execute strategy. Without a TRO, Cadence may never be able to trace how or where Mr. Applebaum uses its trade secret information in this competitive role, which poses a great threat of irreparable harm to Cadence. *See* Scannell Decl. ¶ 6. Further, Mr. Applebaum could easily consult the extensive number of files he stole while working at a competitor, even if none of the files or information pass through the competitor's servers, emails, or otherwise. His continued ability to access the misappropriated materials—in the absence of a TRO—will render it almost impossible for Cadence to trace when and where its proprietary material was, and continues to be, used, accessed, or disclosed. Courts routinely find irreparable harm where, as here, the defendant retained proprietary and confidential information, was highly likely to use such information given that he had transferred to a competitor, and where such use would be "virtually untraceable." *See Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 11, 2017) ("The root problem remains that … [former employee] downloaded and retained possession of over 14,000 confidential Waymo files—at least some of which likely contain trade secrets—for the ostensible purpose of using

Gibson, Dunn &
Crutcher LLP

the information therein in his work for a competitor.  He can easily and at any time consult that information to further defendants' LiDAR development even if none of the files ever actually pass through an Uber server. Such misuse of Waymo's trade secrets might be virtually untraceable.").

Further, Mr. Applebaum is highly likely to destroy evidence relevant to Cadence's claims, which could make it impossible for Cadence to ultimately know *where* its proprietary materials and trade secrets have already been distributed—to which individuals and which entities.  He has already been caught red-handed trying to delete evidence of his theft. *See supra* pp. 3, 13.  Mr. Applebaum also already demonstrated a complete disregard for his obligations of confidentiality to Cadence—by, among other things, impermissibly accessing and transferring Cadence's proprietary information and trade secrets in violation of his contractual obligations to Cadence and the law.  He has also demonstrated a tendency to lie, having initially concealed his theft in his exit procedures and then lying in discussions on December 15 and 18, and again in his December 18 sworn statement.  For these reasons, Cadence's proprietary and trade secret information has been shown to be under attack, and Mr. Applebaum has shown himself to be someone who cannot be trusted to assist Cadence in uncovering the truth, and stopping the bleeding.  Cadence is under great risk of irreparable harm.

### 3. The balance of hardships favors Cadence

The balance of hardships in this case also compels issuance of the requested TRO.  As described above, Cadence will suffer irreparable harm if Mr. Applebaum is allowed to continue possessing (and potentially disclosing) Cadence's proprietary materials and trade secrets.  By contrast, Mr. Applebaum will suffer little harm from being enjoined from using, disclosing, communicating, or otherwise misappropriating Cadence's proprietary materials and trade secrets—which he has no legal right to access, use, or disclose in any event.  Hardship to Mr. Applebaum is minimal or non-existent because he would be enjoined only from activity that is illegal or improper.  And he already conceded in his sworn statement that he had no right to or possessory interest in the stolen materials, and that he violated his employment agreement when he misappropriated those materials. Gee Decl. ¶ 7, Ex. 2; *see Fitspot Ventures, LLC v. Bier*, 2015 WL 5145513, at *4 (C.D. Cal. Sept. 1, 2015) ("Plaintiff has provided a compelling case that according to the Confidentiality Agreement this property never belonged to Defendant in the first place.  Therefore, the Court fails to see how returning the information could

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

Gibson, Dunn &
Crutcher LLP

possibly harm Defendant."); *Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (finding that the balance of hardships favors plaintiff because defendant is only enjoined from conduct that is already prohibited under confidentiality agreement).

### 4.    A TRO is in the public interest

Finally, a TRO is in the public interest.  The public has a strong interest in ensuring that proprietary materials and trade secrets are protected and that those who illegally misappropriate trade secrets are enjoined from doing so. *See Waymo*, 2017 WL 2123560, at *11; *Comet Techs.*, 2018 WL 1990226, at *5; *Bank of Am., N.A. v. Lee*, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) ("While California has a strong public policy in favor of competition, this interest yields to California's interest in protecting a company's trade secrets.").  Further, public policy favors the enforcement of contracts like the confidentiality agreements Mr. Applebaum signed, and subsequently breached, by using and distributing Cadence's proprietary and trade secret information. *Henry Schein, Inc.*, 191 F. Supp. 3d at 1078 ("The public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.").

### B.    The TRO Should Be Issued *Ex Parte* and Without Notice

The requested TRO should be granted *ex parte* and without notice because it is likely that Mr. Applebaum will copy and distribute (and attempt to hide) the stolen material, and that he will destroy any evidence of use, copying, and disclosure that has occurred thus far, which, critically, will eliminate the ability of Cadence and this Court to trace *where* the material has ended up thus far.

As noted above, a court may issue an *ex parte* temporary restraining order without notice where the moving party establishes "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).  *Ex parte* orders are proper in cases where "notice to the defendant would render fruitless the further prosecution of the action." *Reno Air Racing Ass'n*, 452 F.3d at 1131; *Shutterfly, Inc.*, 2012 WL 2911887, at *4 (granting *ex parte* TRO where "defendant ignored signed obligations regarding the [misappropriated trade secrets] at issue").

Here, *ex parte* relief without notice is appropriate because Mr. Applebaum has demonstrated a willingness to conceal his misconduct and misrepresent his behavior. *Comet Techs.*, 2018 WL

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

Gibson, Dunn &
Crutcher LLP

1990226, at *5 ("Plaintiff's concerns [regarding irreparable harm] are justifiably heightened because of … Defendant's false representations to Plaintiff during Defendant's exit interview."); *OOO Brunswick Rail Mgmt.*, 2017 WL 67119 (granting *ex parte* TRO where defendant sent several confidential documents to his personal email account without authorization, deleted the sent messages, and refused to return his company-issued mobile phone and laptop); *V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120 (D. Nev. 2013) (granting *ex parte* TRO and finding irreparable harm because "'[p]ublic disclosure of a trade secret destroys the information's status as a trade secret'… Such destruction causes irreparable harm to the trade secret owner 'by both depriving him of a property interest and by allowing his competitors to reproduce his work without an equivalent investment of time and money.'").

If Mr. Applebaum is provided notice, it is very likely that he will delete incriminating evidence—as he already has—from his personal electronic devices and personal email accounts. And not only delete the evidence, but also engage in practices to hide his conduct, like defragmentation. His past successful effort to delete evidence of his misappropriation, and his misrepresentations following that conduct, demonstrate that there is a high risk that he would do so again if given the opportunity. Cadence is concerned that absent *ex parte* relief without notice, Mr. Applebaum will successfully hide information indicating *to whom* he has already disclosed Cadence's proprietary information, which would irreparably harm Cadence, given that Cadence would have no recourse and no way of ensuring that whatever harm has already been done is contained. Simply put, the fact of his prior deletion and repeated false representations compels *ex parte* relief without notice under these circumstances. *See Fitspot Ventures*, 2015 WL 5145513, at *3 (granting *ex parte* TRO where Defendant "maintain[ed] a hard drive with information that was suppose[d] to be turned over to Plaintiff"); *Shutterfly, Inc.*, 2012 WL 2911887, at *4.[2]

---

[2] This Court has broad discretion to determine the amount of security prior to issuance of a TRO. Here, the amount of any bond, if any, should be nominal. Fed. R. Civ. P. 65(c); *see also Cutera, Inc.*, 444 F. Supp. 3d at 1210 ("A district court retains discretion 'as to the amount of security required, *if any*.'") (emphasis in original) (citation omitted). A district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Courts in the Ninth Circuit have found no bond—or only a small bond—appropriate where, as here, a plaintiff merely requests the return of *its own* confidential information and to prohibit the use of that information by a defendant based on the reasoning that "it is Plaintiff's property at issue, and any injury to Defendant is highly unlikely." *Fitspot Ventures*, 2015 WL 5145513, at *5; *see also Henry Schein, Inc.*, 191 F. Supp. 3d at 1078

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

Gibson, Dunn &
Crutcher LLP

1

2

**C.      As Part of the TRO, Cadence Requests an Order to Preserve and Seize Evidence Under Fed. R. Civ. P. 65 and Under the Court's Inherent Authority**

3    In addition, Cadence requests an order to preserve and seize evidence in Mr. Applebaum's

4  possession before he has the opportunity to tamper with or delete it.  This relief is necessary in light of

5  his demonstrated capacity to delete and manipulate Cadence proprietary materials to hide his tracks

6  even *after* he is asked not to do so (and then to lie about it).  There is reason here to believe that once

7  Mr. Applebaum finds out about the TRO—even if it is issued *ex parte* without notice—he will brazenly

8  disregard the Court's order and destroy evidence, consistent with his pattern and practice.

9    Federal courts are empowered by Federal Rule of Civil Procedure 65, as well as pursuant to

10  their inherent authority, to enter orders for the preservation of evidence, and to grant a seizure order in

11  furtherance of that preservation order, as part of the TRO.  *See Reebok Int'l Ltd. v. Marnatech Enters.,*

12  *Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (federal courts may order seizures under their inherent authority

13  as they have "the power to issue a preliminary injunction in order to prevent a defendant from

14  dissipating assets in order to preserve the possibility of equitable remedies").  In evaluating whether to

15  issue an evidence preservation order, courts consider (1) concerns "for the continuing existence and

16  maintenance of the integrity of the evidence in question"; (2) "any irreparable harm likely to result to

17  the party seeking the preservation of the evidence;" and (3) "the capability of an individual, entity, or

18  party to maintain the evidence sought to be preserved."  *Jardin v. Datallegro, Inc.*, 2008 WL 4104473,

19  at *1 (S.D. Cal. Sept. 3, 2008).  Such orders are particularly appropriate where, as here, there is a risk

20  of deletion of relevant evidence.  *Cutera*, 444 F. Supp. 3d at 1211 (issuing evidence preservation order

21  where former employees "already deleted many files containing Cutera information … about the same

22  time they left the company"); *Comet Techs.*, 2018 WL 1990226, at *6 (issuing evidence preservation

23  order where "Defendant removed information from Plaintiff without authorization and immediately

24

25  (finding no bond should be required because the TRO would not cause any damage to defendant's
legitimate business).  Here, the likelihood of harm to Mr. Applebaum resulting from Cadence's

26  requested relief is minimal or non-existent because Cadence seeks only to enjoin him from illegal or
improper activity.  Accordingly, Cadence requests that no bond should issue, but should the Court

27  require one—it should not exceed $5,000. *See, e.g., Fitspot Ventures*, 2015 WL 5145513, at *5 ($5,000
bond appropriate, "in light of the fact that it is Plaintiff's property at issue, and any injury to Defendant

28  is highly unlikely"); *see also Cutera, Inc.*, 444 F. Supp. 3d at 1211 ($5,000 dollar bond appropriate
where employee stole trade secretion information).

Gibson, Dunn &
Crutcher LLP

22

before Defendant resigned in order to work for one of Plaintiff's competitors").

Here, there is a serious risk that Mr. Applebaum will destroy evidence that is critical to Cadence's ability to mitigate the irreparable injury at issue. He has already demonstrated his capacity and willingness to delete files and repeatedly lie about it (even under oath). If he does so again, Cadence will not know where its proprietary information has already been distributed. That alone warrants this relief. But in addition, Mr. Applebaum is going to work for a competitor, further supporting the fact that Cadence needs to know if he has sent the materials to anyone at the competitor, or to yet another device that he will have access to while working for the competitor. If he is permitted to further hide his tracks, Cadence will forever lose the ability to know where its proprietary materials and trade secrets have ended up. *See Comet Techs.*, 2018 WL 1990226, at *6 ("irreparable harm is likely to result to Plaintiff if the evidence is destroyed because Plaintiff will be unable to determine the extent of the damage to its business"). In short, this situation involves a confluence of the worst facts— all in one case—warranting heighted relief.

The potential harm to Cadence from such a sequence of events greatly outweighs any purported harm to Mr. Applebaum, who would be simply turning over materials that he does not own, has admitted he does not own, has lied about having under penalty of perjury, and for which he has no lawful use. As a result, an order requiring the preservation of evidence and a seizure order in furtherance of that preservation order, is highly appropriate. *See Zendar v. Hanks*, 2020 WL 4458903, at *6 (N.D. Cal. May 27, 2020) (granting injunction "that would require [defendant] to return all of Zendar's trade secrets and confidential information and to preserve all evidence"); *Marina Dist. Dev. Co., LLC v. AC Ocean Walk, LLC*, 2020 WL 5502160, at *8 (D. Nev. Sept. 10, 2020) (ordering the "immediate[] return of all of Plaintiffs' property or any copies made of such property"); *Verigy US, Inc. v. Mayder*, 2007 WL 2429652, at *4 (N.D. Cal. Aug. 24, 2007) (same); *Magnesita Refractories Co. v. Mishra*, No. 2:16-cv-00524-PPS, Dkt. 10 (N.D. Ind. Dec. 20, 2016) (ordering seizure of laptop on the day of the order, pursuant to Rule 65); *Future Motion, Inc. v. Changzhou First Int'l Trade Co.*, No. 2:16-cv-00013-MMD-CWH, Dkt. No. 11 (D. Nev. Jan. 6, 2016) (ordering seizure of evidence of intellectual property theft, with the assistance of U.S. Marshals Service, pursuant to Rule 65 and

Gibson, Dunn & Crutcher LLP

23

1   inherent authority).[3]

2   **D.   Cadence Requests an Expedited Discovery Order**

3       Cadence requests expedited discovery, including a deposition of Mr. Applebaum and the
4   production of documents. As set forth in the proposed order in Exhibit A, Cadence proposes the parties
5   work with the Court to come up with a proposed schedule for the expedited discovery at the hearing
6   shortly following issuance of the TRO.

7       Federal courts have broad discretion to expedite discovery for good cause. *See In re*
8   *Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d 1160 (C.D. Cal. 2008). "Good cause exists
9   'where the need for expedited discovery, in consideration of the administration of justice, outweighs
10  the prejudice to the responding party.'" *Id.* (citation omitted). Factors commonly considered in
11  determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a
12  preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for
13  requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and
14  (5) how far in advance of the typical discovery process the request was made. *Am. Legalnet, Inc. v.*
15  *Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009) (citation omitted).

16      Here, without expedited discovery, Cadence will be unable to determine the nature and full
17  extent of Mr. Applebaum's trade secret misappropriation. Any inconvenience to Mr. Applebaum
18  resulting from this discovery is far outweighed by Cadence's need to uncover the full extent of his
19  misappropriation. *See, e.g., Comet Techs.*, 2018 WL 1990226, at *7 (granting expedited discovery in
20  order granting *ex parte* TRO).

21

22  [3] The Court is also authorized to issue a seizure based on Cadence's DTSA claim, pursuant to 18 U.S.C.
    § 1836(b)(2)(A)(i). *See, e.g., Axis Steel Detailing, Inc. v. Prilex Detailing LLC*, 2017 WL 8947964, at
23  *2 (D. Utah June 29, 2017) (granting *ex parte* seizure order in light of the fact that: "Defendants have
    a high level of computer technical proficiency," "there have been attempts by Defendants in the past
24  to delete information from computers, including emails and other computer data", and "Defendants
    have shown a willingness to provide false and misleading information."); *Blue Star Land Servs. v.*
25  *Coleman*, 2017 WL 11309528, at *1 (W.D. Okla. Aug. 31, 2017) (granting *ex parte* seizure order where
    "Defendants could easily copy the information onto another computer or other storage media without
26  the knowledge of Plaintiff or the Court."); *AVX Corp. v. Kim*, 2017 WL 11316598, at *2 (D.S.C. Mar.
27  13, 2017) (granting *ex parte* seizure order, noting that "[Defendant's] likelihood to evade, avoid, or
    otherwise not comply with such an order is demonstrated by his deceptive actions when he *repeatedly*
28  *lied* and attempted to conceal the fact that he surreptitiously accessed and downloaded the Stolen
    Computer Files.") (emphasis added).

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE

1    **E.    Cadence Requests a Limited Protective Order**

2        Cadence requests the entry of a limited protective order to require that the Scannell Declaration,

3    Exhibit 1 to the Gee Declaration, and Exhibits B and C to the Hammerquist Declaration, as well as

4    similar confidential information that may arise in this case, be disclosed subject to an "Attorneys' Eyes

5    Only" restriction.  Federal courts may, for good cause, issue a protective order "requiring that a trade

6    secret or other confidential research, development, or commercial information not be revealed or be

7    revealed only in a specified way[.]" Fed. R. Civ. P. 26(c)(G).  Courts in the Ninth Circuit have found

8    an "Attorneys' Eyes Only" restriction appropriate to protect a litigant's trade secret information from

9    disclosure to a competitor or someone working for a competitor and prevent competitive harm.  *See*,

10   *e.g.*, *Nutratech, Inc. v. Syntech (SSPF) Intl., Inc.*, 242 F.R.D. 552 (C.D. Cal. 2007).  Here, the Scannell

11   Declaration, Exhibit 1 to the Gee Declaration, and Exhibits B and C to the Hammerquist Declaration

12   contain and/or discuss Cadence's trade secret information, and the purpose of this litigation is to stop

13   Mr. Applebaum's further access to that information.  A protective order should issue to prevent him

14   from any continued access through this litigation to Cadence confidential materials.  Cadence's

15   proposed protective order is included in its proposed order, attached hereto as Exhibit A.

16                                **V.    CONCLUSION**

17       For the foregoing reasons, Cadence respectfully requests that the Court grants its *Ex Parte*

18   Application for a TRO without notice, Evidence Preservation Order, Limited Seizure Order,

19   Expedited Discovery Order, Protective Order, and Order to Show Cause Why a Preliminary

20   Injunction Should Not Issue.

21

22   DATED: January 16, 2024            Respectfully submitted,

23                                      GIBSON, DUNN & CRUTCHER LLP

24                                      By: _____

25                                           L. Kieran Kieckhefer

26                                      *Attorneys for Plaintiff*
                                        *CADENCE DESIGN SYSTEMS, INC.*
27

28

Gibson, Dunn &
Crutcher LLP